May it please the Court, Teal Luthy Miller from the Department of Justice on behalf of former INS Commissioner Ziggler, Mr. Aguilar, Mr. Chavez, Mr. Campbell, and Mr. Obergon. Subsequent to the close of briefing in this case, the appearance of a conflict developed in my representation or the Department's representation of Defendant Hunt and Mr. Chapman is here and will represent him. I'm going to try and reserve three minutes for him and some minutes for myself as well for rebuttal. The Supreme Court's decision in Iqbal changed the law in two significant respects for this complaint. First, it made clear that supervisors are only liable under Bivens if they personally violate a plaintiff's right. It rejected a broad inference based on allegations made against subordinates, the inference that that applies to the supervisors, unless there was some factual support for that inference. It says supervisors are liable for their conduct, not for their status. The second important point about Iqbal, it made clear that merely alleging that the defendant violated the plaintiff's rights isn't enough. There must be sufficient facts pled to make that sort of ultimate allegation of legal liability plausible. Under these standards, defendants are entitled to judgment on the pleading. The principal allegation against them, paragraph 26 of the complaint, says that they have personally reviewed and thus are responsible for roving patrol operations. That allegation is defective under Iqbal for a host of different reasons. First, it's conclusory. It's an allegation of all. But you didn't move in your motion below on grounds of qualified immunity. You moved on failure to you. It was a 12C motion, right? It was a motion for judgment on the pleadings on the basis of qualified immunity, on the basis that the complaint failed the test in Iqbal, which Iqbal itself assumed the Supreme Court said it had jurisdiction to consider whether the pleadings in that case were sufficient on an interlocutory appeal. So there is jurisdiction, if that's what you're asking. Yes, that's what I'm asking. Yes. And you actually raised it in a number of pleadings. Yes, Your Honor. We have consistently, we have consistently asserted that these defendants should not be, should be dismissed from the case. We dismissed, we actually won that in district court in 2002, and then there was an appeal to this court, and this court reversed that determination based on precisely the inference that Iqbal makes clear is impermissible with respect to supervisors. If I may continue, there are, as I said, I think a host of reasons as to why this paragraph 26 is defective. It's conclusory. It has this thus in it. They personally reviewed and thus are responsible, basically. And Iqbal says, you know, that's the inference, that you have to have facts to back up. There aren't such facts here. It's pled in the alternative. They either ordered, directed, sanctioned, or permitted, which makes clear that it's purely speculative. Defendants aren't alerted to what exactly it is they're thought to have done. It says roving patrols, not suspicionless searches. So to the extent you even accept that any of these supervisors were aware of it, and I want to be clear that there are six different individuals and the acts alleged against them have to be considered separately, the former commissioner of the INS, Mr. Ziegler, was, for one thing, not the acting commissioner, as alleged in the complaint at the time, and also there's no reason to believe it. Do you represent Ziegler or your colleagues? I do. Okay. I represent all of the defendants except for the defendant. Okay. Okay. There's no reason to believe, based on the facts in the complaint, that he had any awareness of the shuttle. Mr. Aguilar was the head of the whole Tucson sector, which was the largest sector of the Border Patrol. Again, nothing in the complaint suggests that he had any awareness of the shuttle. As to the other defendants, the only knowledge is paragraph 26, and then there's another paragraph which says they, at various times, complained of frequent stops to these individuals. How many times? And stops isn't illegal stops. So merely if someone comes in, if someone, if you encounter a member of the public who says, I keep getting stopped, there's no reason to believe that those stops are illegal unless that's specified to the defendants. And finally, it isn't plausible. The district court was with us up to here. It said that the allegation in this complaint is strikingly similar to the allegation found inadequate in Iqbal. But then it said, oh, but we think in Iqbal the difference is it was, it wasn't plausible there that the attorney general and the director of the FBI had a motive to discriminate, but here it's plausible that they had a motive to violate the Fourth Amendment. Because of allegations that go to a violation of the Fifth Amendment rather than the Fourth Amendment. And for the reasons we've explained in our brief, we think that's a legal error. Your Honor, I think one of the difficult parts of this case, if I can explain it, is this Court's decision in Starr v. Baca, which, as you may know, there was a certain petition filed in that case about six days ago, so if this Court felt that it couldn't adequately distinguish, it could wait and hold this case until Starr was disposed of by the Supreme Court. But we think that it's distinguishable because it's a case about deliberate indifference under the Eighth Amendment, and this is a case about what you have to show to show. Kennedy, did you say Starr? The Supreme Court granted Starr? No, no. I'm sorry, Your Honor. A cert petition was filed on December 30th. Oh. There hasn't even been a brief in opposition filed yet. Well, there was a lot of disagreement on our court. Yes. I think there's a – it's certainly possible to imagine the Court granting Starr in that case. So what you have to show to allege that a supervisor violated the Fourth Amendment after Iqbal is that they personally directed a violation of the Fourth Amendment. And the way we know that is the combination of two of the Supreme Court's cases, Brower against County of Innu and County of Sacramento against Lewis, which talk about when there is a seizure for purposes of the Fourth Amendment and say, Brower uses the phrase, "'Government termination of freedom of movement through means intentionally applied.'" So just as the Fifth Amendment requires purposeful discrimination, the Fourth Amendment, at least if you're talking about whether something constitutes a seizure under the Fourth Amendment, it requires intentional action. It requires the supervisor to direct his underlings to violate the Fourth Amendment. And without that direct order, there's no liability for a supervisor for claims of a Fourth Amendment violation after Iqbal. I understand your position with respect to Mr. Ziegler, because he was way up the line. In the case of the other defendants, with the exception of the one that's represented by your colleague there, it appears that there were repeated complaints made about the ongoing, from their perspective, harassment, stopping, et cetera, et cetera. And specifically, they were made to hunt Obregon, Chavez, and Campbell. Your Honor, they were not. Does that make any difference in terms of whether they are entitled to qualified immunity in this case? No. An important parenthetical first. There is no such allegation with respect to Defendant Aguilar, either, who was the head of the Border Patrol. So no. Yes, I know. I thought I just said hunt and not Obregon. Yes, you did. But I just wanted to say that because we hadn't mentioned Aguilar, he is a high-level supervisor in a position similar to Obregon. Yes. Your argument goes to the supervisors. Yes. These four were also supervisors. Excuse me. And if you applied what you say to the supervisors and took that out, there's still enough, I suggest to you, for hunt and Obregon that are allegations in addition to the supervisors. Do you agree with that? Your Honor, I don't. I'm going to allow Mr. Chapman to address the question with respect to Mr. Hunt. With respect to Mr. Obregon, the only specific allegation is to him is that after some unnamed agent arrested plaintiffs with people on board the shuttle who the complaint doesn't make clear, but I don't believe the complaint makes clear. I'll check that and let you know in rebuttal. That one of the plaintiffs was transported to Silver Bell Station and Mr. Obregon interviewed her. So he's entitled to rely on his fellow officer's arrest. He's entitled to believe that she was brought in, she was arrested lawfully. All he did was question her. That doesn't show that he participated in a violation of the Fourth Amendment. It shows that he, relying on a fellow officer's arrest, performed the questioning. Well, I understand that. But what I'm suggesting to you is that there's at least two of the defendants that you have to go a second step, even if we agree with you on the supervisory issue. And I have read what you have read, and I'm just curious on your response of whether or not there's enough there at the pleading stage. No, I don't think there is, for the reasons I just explained. But the only thing different about Defendant Obregon than the other supervisors is the allegation that he questioned one of these plaintiffs after she was arrested. There's no allegation that the arrest was unlawful or not based on probable cause. So all we know about him is that in one instance, after she had already been arrested, after the stop had already occurred, he questioned her. That doesn't show that he was directing illegal stops, which is what they have to show. I wasn't sure whether you had an opportunity to respond to Judge Smith's question about does it make a difference that the allegations are that these various, not all the supervisors, but certain of them, received numerous complaints about alleged infringement of their rights in these searches. I don't think so, Your Honor, because the allegation is, I believe it's Paragraph 25 of the complaint, which is on page 59 and 60 of the excerpts of records, that they complained of frequent stops at various times. A stop is not an illegal stop. And so the fact that they were aware of that some individuals had said to them, we keep getting stopped, does not give them responsibility for having directed future stops as supervisors. And that's what you have to show to show a violation of the Fourth Amendment as a supervisor post-Tickball. If I may reserve the remainder of my time for Mr. Chapman and rebuttal. So just so I understand, Mr. Chapman, you're going to take the balance of the time or you're going to leave a portion for rebuttal for one of you? I can leave a portion. Whatever you want to do. I just wanted to call out your attention. Thank you. May it please the Court. I'm here on behalf of Ralph Hunt, the appellant in this case. My name is Sean Chapman. I want to confine my comments directly to an issue that you raised, which is he is a supervisory defendant, but he was also, it's alleged, to be directly involved in some of the events in the complaint. And I want to address that. And I think one of your concerns, Judge, was does that relieve him of being able to use Iqbal as a defense in this case, essentially? And my analogy here is that when the plaintiffs came and they complained to him and said we're being repeatedly stopped by the shuttle service, he as a supervisory defendant is under an Iqbal analysis basically aware of, he has knowledge in, and he acquiesces in some sort of allegedly unconstitutional behavior, but his involvement is not purposeful. And under Iqbal it needs to be purposeful. He needs to get involved and do something that violates the Constitution. Now, additionally, with respect to Hunt. Let me just be sure I understand your point here. You're saying that in the case of your client, Mr. Hunt, right? Yes, sir. He gets these letters. He put on notice. He maybe talks to his people. But under Iqbal, is he just home free on that? Even if he knows perfectly well what's, in quotes, going on, if indeed there is a violation, and he gives them a wink and a nod and goes on, because that's not all alleged, he's home free under Iqbal. Is that your position? I think that's correct, because under Iqbal there is no vicarious liability for supervisory defendants. So knowledge and acquiescence in some sort of unconstitutional behavior is not going to get him on the hook. So they would, in order to survive Iqbal, and with respect to your client, they would have had to say that, you know, Mr. Hunt was informed that there was an illegal stop that was occurring repeatedly here. He was asked to do something about it. He refused to do something like that. Is that correct? I think it would go beyond that. I think he would have to not only acquiesce in it, but direct it, say, keep it up. Okay. He'd have to do something affirmative. Wasn't there an allegation, it may not relate to Mr. Hunt, that the defendants purposely failed to keep records? And isn't that a circumstantial evidence for which you can draw an inference of intent? That is, in my view, a bald-faced allegation that's not supported by any facts in this case, which is exactly the type of allegation that's disapproved of in Iqbal. It's a Tell us what you say. They didn't keep records, except to say they didn't keep records. I don't think there's any evidence in the record to support that. Well, this is pleadings. This is a motion on the pleadings. Oh, I agree with that. But I also think that that's the type of allegation that's disapproved of under an Iqbal analysis. I have a minute left. Can I just raise this here? Because your guy's Hunt. I'm looking at paragraph 35 of the first amendment complaint. In the winter of 2000-2001, Agent Hunt stopped plaintiff's van and told plaintiff Jose Chavez that he was under arrest. After checking his license, Hunt demanded the plaintiff return the fare of the passengers, which plaintiff did. Now, that's the one where there was the actual arrest. Is that what this is? It's not the previous allegations? There were two stops. One resulted in his arrest because I think – well, I don't want to speak outside the record, but I believe that the allegations in the amendment complaint as to that stop showed that the entire van was – everyone in the van was undocumented. The other one was a stop which resulted in the seizure of the van. But that's not in the pleading. Yes, it is. Is it? Yes. In the pleading, the plaintiff's complaint, it says that everybody in the van was undocumented. Yes. Now, I don't remember whether it's that stop or the second stop, but there are two stops. The other stop resulted in the seizure of the van and taking the van to Three Points, Arizona or seizing the van and taking the plaintiff to Three Points, Arizona. I guess what I'm struggling with here is you've treated Hunt as if he's this guy up there and there's just no allegations that really tie him specifically. And this 35 clearly does tie him to a direct involvement with the plaintiffs in the stopping of the vehicle. Now, I noticed that in this case, though, it does not – it doesn't say a whole lot more except defendant Hunt and another Border Patrol agents have demanded that Plaintiff Jose return the fare to the passengers on board. That seemed to be the previous one where there was no illegality discovered. Correct. If we find that the complaint does allege that Hunt was personally involved and was involved in the arrest and it was an, in quotes, illegal arrest, and I'm not saying it was or not because we're at a pleading stage here, then the Iqbal defense doesn't work for you, does it? I think it does because under Iqbal, allegations in a complaint must be more than conceivable. They must be plausible. Well, they arrested him. Well, but here you have to keep in mind the complaint doesn't actually allege that he violated their rights, and there is a plausible reason for the stop and seizure on each occasion. This is a notorious alien smuggling route. The plaintiff's complaint admits that 20 percent of the stops were based on reasonable suspicion. The shuttle had been stopped before with undocumented individuals in it. So I'd hope to be able to save some time for my question. Well, we may give her a minute or something like that, but I think we get your point, unless any of my colleagues have more questions for you. Thank you very much. Thank you. We'll hear now from the appellee. May it please the Court. Armin Solis on behalf of the Chavez's, Your Honors. And before I proceed with my argument, I would point out with respect to Mr. Hunt that if you look at allegations 76 through 85 of the first amended complaint, it was Hunt, not another Border Patrol officer, who pulled over the shuttle. He was parked. The allegation is that he was parked along the side of the road. He saw the shuttle drive by and waved it over. So he was the one that stopped it on that second occasion. So you have two stops by Officer Hunt that's alleged in the complaint. And those are the allegations of illegality or the common allegations, right, that apply to everybody. Is that correct?  Your Honor, the pleadings in this case, the factual pleadings in this case are, and I think it's necessary to repeat them so that everybody understands exactly what the Court has to consider as true here as the standard for determining whether or not we've stated a claim and whether or not the defendants are entitled to qualified immunity. The plaintiffs have claimed they are Hispanic, that they have, that their customers are primarily Hispanic, that they operated a daily shuttle from 1995 through 2002 between Sassavie, Arizona, and Tucson, Arizona, that they were stopped almost daily by the Border Patrol, that the only thing about the shuttle that the officers would see is that it was moving and that there were occupants in the van and they were Hispanic. They allege that all these stops were illegal, that they lacked a warrant, they lacked probable cause and reasonable suspicion. And they also pled that these stops were based upon the Hispanic appearance of the occupants of the vehicle and nothing more. These are all facts that are pled. Paragraph 26 that the counsel points out in the First Amendment complaint alleges on information and belief, and that is an appropriate allegation even under Iqbal, that plaintiff alleges that from time to time defendants Hunt, Obregon, Chavez, Campbell, Aguilar, and Ziegler personally reviewed, and thus knowing ordered, directed, sanctioned, or permitted the roving patrol activities and operations as set forth in paragraphs 88 et sec, conducted by Border Patrol agents as set forth in the paragraphs herein. It's not just that they'll say those are just conclusory allegations. But when you say that this person directed the agents to engage in this conduct. Well, your adversary says that the weasel word there is the word thus. So the allegation, the only factual allegation is that they, in 26, is that they personally reviewed the operations. And then you say, and thus knowingly ordered, directed, sanctioned, or permitted. It doesn't follow that because they personally reviewed it, they ordered, directed, sanctioned, or permitted it. That's not stated. It's not a factual allegation. It's an allegation in effect of vicarious liability. Well, that is not the only allegation, Your Honor. You have to take it into context. And we refer to the other paragraphs in the complaint. One, these stops were daily. They knew that. They keep records of that. They knew that this van was being stopped on a daily basis. The plaintiffs have alleged that the stops were made because of their Hispanic appearance, nothing else. The plaintiffs have alleged that they and the majority of the passengers are Hispanic, that the agents, when they stopped them, have referred to the passengers and to the plaintiffs in less than complementary terms, in derogatory terms, that were racially tinged in terms of their appearance. But we're talking now, at least we've been focusing on the defendants who were not there. That's not all the defendants here, but that's many of them. That's many of them, Your Honor. And understand that the roving patrols that were extant in the Tucson sector at the time of this case were approved by Ziegler. We allege that. Were directed by Ziegler. Aguilar was the Tucson sector head. You're not saying the roving patrols are all illegal, are you? I'm not saying, no, Your Honor, I'm not. This is just the difference between whether we have a checkpoint and whether we patrol. So that they approved roving patrols doesn't get you very far unless every one of them is illegal. Well, Your Honor, in this instance, when all you have is a van coming from a small town right on the border. No, you don't get my point. You're saying that Ziegler should be tied in because he approved roving patrols. We've held again and again and again that roving patrols are all right so long as they have the necessary findings for making a stop. That's the only problem. But we've never said that roving patrols are illegal. Well, no, the court has not. The court has said, however, that roving patrols where stops are based solely on Hispanic appearance or the presence of Hispanics in areas where there is a smuggling route are illegal. Not the smuggling route. We've got some cases on that. But I'm getting to Ziegler. You said that Ziegler is in because he approved roving patrols. I'm suggesting to you that there's nothing wrong with Ziegler approving roving patrols. And I agree with that. But when you direct, when you have knowledge of the illegal acts of your supervisors below him and of his agents below that, then that becomes a whole other question. How do you get around Al Kitt with respect to Ziegler? I know a little bit about Al Kitt. And I don't understand how you get past that. Well, Al Kitt was not a Fourth Amendment case, Your Honor. It was the qualified immunity that was granted there was granted because it wasn't a common, well-known area of the law that was violated. That's what Al Kitt said. Here we're dealing with the Fourth Amendment. I mean, the Ninth Circuit has repeatedly ruled that stops of vehicles based upon ethnic appearance are illegal. And, indeed ‑‑ But, again, with respect, I guess what I'm struggling with is as a proposition, you may be correct, but you're talking about, at least in some instances here, people who are well up the chain of command. Ziegler is the ‑‑ I guess he's the acting director of ‑‑ He was the acting director. He's way up the chain. And I think the Supreme Court's made it really clear you can't pull these people in to cases of this nature unless you've got some really strong allegations that personally tie him, in this case, to what happened, his direction, his direct involvement, his direct understanding, and that, on top of that, that it's plausible. And I don't see that with respect to Ziegler. Let's just focus on Ziegler for the moment. Where are the allegations? When we look at this in our conference, what allegations of the complaint would you like us to focus on with respect to Ziegler that you think just absolutely gets you past Iqbal and to the degree applicable Al Kidd? Well, Your Honor, you know, if you take out dust, do we get there? How do you plead the head of an agency's behavior when a course of conduct has occurred over seven years? That's what happened in this case, Your Honor, on an almost daily basis over seven years. But with respect, my colleague has pointed out to you that our case law, which submits Supreme Court case laws, that it's perfectly all right to have these roving patrols. That's not a problem. What you're saying here is that in this, with respect to your clients and their situation, that there was no, certainly no probable cause, not even reasonable suspicion, other than their Hispanic appearance, that caused them to be stopped. Right. And you're saying under our case law, that's illegal. You can't do that. But you've got to tie the defendants to that action. I don't see anything, unless I'm missing something in the complaint, that says that Ziegler knew that officers were stopping your clients' vehicles repeatedly and stopping them because they had a Hispanic appearance. Did I miss something? Well, no, Your Honor. You haven't missed anything. I mean, the complaint is the complaint. Paragraph 26, I think, is about as specific as you can get. And because it refers to the other paragraphs. I mean, you can read it by itself, but it says that the defendants, all of them, including Ziegler, personally reviewed and thus knowingly ordered the reference. With respect, that's the very kind of thing that Iqbal says doesn't work. And before that, Tuamli, that's a conclusory allegation. It is conclusory in this regard. I guess the question here becomes, at what stage do you hold the person that runs the agency responsible for the acts of the subordinates in the agency when they have notice of the illegal conduct of their subordinates? And how did they have notice here? Well, the Ninth Circuit has ruled repeatedly regarding Border Patrol, not Casio, that stopping agents, stopping motorists because of their Hispanic appearance is illegal. And in this particular case, Your Honor, in 1997, the Tucson Border Patrol was sued in a class action matter for the very same conduct. This court, in two cases, and I'd ask the court to take judicial notice of it, in the case of Hodges-Durgeon v. De La Vina, 165 Fed 2nd, 667, and reversed in Bonk, 199 Fed 3rd, 1037. Wait a minute. You're citing as a case that was reversed on Bonk? Well, it was reversed on standing grounds for the two named plaintiffs on the basis that the ---- So you're saying that something survived when it was ---- it wasn't the case vacated when it went on Bonk? It was vacated, Your Honor. Well, then you can't cite it to us. I'm not ---- No, the ---- on Bonk was not vacated. No, no. That was a public decision. There was a published opinion, or at least in a three-judge panel opinion. Right. That opinion was taken on Bonk. At that point, an order would have been issued by the court vacating that decision. Is that correct? That's correct. And under our rules, you can't even cite that case to us. It has no value whatsoever. You can cite to us the on Bonk decision. I'm not citing it as authority. I'm citing it as knowledge by the agency that it was engaged. Its officers in the Tucson sector were engaged in an illegal practice. So a case that has no legal precedent or value whatsoever is the notice to which you want me to take. You want me to take notice of that case. Yes, I do, in that context, Your Honor. Do you think that ---- I mean, on a very practical CEO level. If I receive an allegation that I've got managers that are sexually discriminating against the females in the office ---- Was Ziegler in that position in 1997? No. De La Vina was. Okay. Well, how does it tie Ziegler in, then, since we've been talking about Ziegler? How is he supposed to be put on notice? Well, because in our paragraph 26, Your Honor, we plead that he knew and directed this operation. I guess the bottom line with Iqbal and Elkid is that you cannot, if the standard is that you have to have direct knowledge of their then you can never have a Fourth or Fifth Amendment claim against the head of agencies. I don't believe that's what ---- That seems to be what the Supreme Court has said. I don't believe that should be the ---- I don't think that either case, Your Honor, changed either Rule 8 and the pleading standards under Rule 8 or ---- I've got to talk to Congressman Waxman and some of his colleagues. They filed a bill to overturn those cases on that very point. So they seem to think that's what the Supreme Court said. Whether they're right or not, far be it from me to say. Well, I would say, Your Honor, that we have ---- we believe we have pled adequately in our complaint, our First Amendment complaint, to bring all of the defendants, the supervisory defendants, within the ambit of Rule 8. And you've ---- there's no point in sending it back. You can't plead anything else. Everything you've got, you've got there, right? Yes. I don't know what else we could say. All right. I mean, you know, it's been 10 years. This case is going to outlive me, Your Honor, before I even get to try it. You're moving along with alacrity. Before you leave, would you entertain another question? Sure. It's a little one of jurisdiction, which always concerns us. We have to have some power before we can write the opinion. If I understand correctly, this is an interim appeal based upon the qualified immunity issue. And the question is whether or not we have tagged that in. That is, what do you have to do to show qualified immunity? Of course, it's a problem for the other side rather than for you. But I just want to see if you have any objection whether you believe that you have properly established the jurisdiction here, whether it has been established, not whether you've established it. You mean whether they waived it, Your Honor? No, no. They can only come up here to see us at this particular stance if qualified immunity is involved. Have they involved qualified immunity, in your judgment? That is, is this properly before us? I would argue no, Your Honor. And on what basis would you argue that? Because their appeal below, their motion below, was on the basis that we failed to state a claim under Rule 12. That might be true. But in that motion, five times they identified qualified immunity. And in the objections raised to the magistrate judge's opinion, twice more they indicated qualified immunity as the basis. Isn't that sufficient to show that qualified immunity is what they're really after? Well, it may have been what they're really after. And as we say, as I say in the brief, Your Honor, I don't think they got there, withstanding what they were really after, but they didn't plead it that way. But I'm suggesting when you mention qualified immunity in your pleadings seven times, I don't think the district judge was at all surprised that they're talking about qualified immunity. I just don't see that argument. I understand, Your Honor. I'm not saying that it's the best position that I have here today, but I'm saying it is my position. Okay. Thank you. Your time is up. I will give you one minute to respond. We know that you will use it brilliantly. Thank you, Your Honor. I have four points. First, paragraph 55 of the complaint, page 63, does say that when Defendant Obergon was interviewing people, which is the only specific allegation to him, the people that the shuttle had been stopped with undocumented aliens. Point two, Judge Rakoff, you asked about records, and the district court said basically records where no records where you might think there would be records gives rise to an inference of guilt or consciousness of guilt. That inference is impermissible after Iqbal. It's also wrong. It may well give rise to an inference that the Border Patrol is quite busy, and I think that the fact that they might have been violated internal policies, and we don't think they were, but if they had, Davis against Shurer makes clear that violating internal policies or administrative regulations about recordkeeping doesn't establish a violation of the Fourth Amendment. Well, I'm unclear why you think it's wrong under Iqbal. I understand the argument you're making on the second part of your argument is that there's an equally plausible alternative explanation. So under Iqbal, you're faced with two plausible. But I don't think you think there's some other? Well, I think it's a can you not fully consistently with Iqbal allege intent through circumstantial evidence? You can through circumstantial evidence. That's right. This is a form of circumstantial evidence. You're just saying it's not a good enough one because there's an equally plausible alternative. Okay. Fair enough. Yes, I am saying that. Three. You're absolutely right, Your Honor, that Al-Kid's holding with regard to supervisory liability still stands. It wasn't reviewed by the Supreme Court and governs the result we've asked for here. Number four, the discussion with regard to qualified immunity. We do think Iqbal establishes that there is jurisdiction to hear this appeal. We also have made an argument that any violation by the supervisors in this case wasn't clearly established. So even if you disagree with me up until this point, and I hope you don't, you need to decide whether any violation by these supervisors was a violation of clearly established law, and it wasn't for all the reasons we've described in our complaint or, I'm sorry, in our briefs. If there are no further questions to be asked. Thank you all for your argument. The case of Chavez v. Ziegler is submitted, and the Court will stand adjourned for the day.
judges: Rakoff, Wallace, Smith